## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| JENNIFER STEPHENS and JAMES BRUNO, on behalf of themselves and a class of all others similarly situated, <div align="right">Plaintiffs,</div> v. TARGET CORPORATION, <div align="right">Defendant.</div> | Civil Action No. **CLASS ACTION COMPLAINT** <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiffs Jennifer Stephens and James Bruno ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, bring this class action lawsuit against Defendant Target Corporation ("Target" or "Defendant") based upon personal knowledge as to themselves, the investigation of their counsel, and on information and belief as to all other matters.

### <u>INTRODUCTION</u>

1.     This is a class action lawsuit against Defendant regarding the manufacture, distribution, and sale of its Target-branded Up & Up "non-drowsy" over-the-counter cold and flu medicines that contain Dextromethorphan Hydrobromide ("the "Non-Drowsy Products").[1]

---

[1] The Non-Drowsy Products include: Up & Up Cold and Flu Daytime, Up & Up Cold Flu Relief Daytime, Up & Up Cold Relief, Up & Up Severe Cold and Flu, Up & Up Severe Cold and Flu Daytime, Up & Up Cough and Chest Congestion DM with Honey – Maximum Strength, and Up & Up Cough Plus Chest Congestion. Plaintiffs reserve the right to amend this list if further investigation and/or discovery reveals that the list should be amended.

2.      The Non-Drowsy Products state prominently on the front of their labels that they are "non-drowsy" and "daytime" products.



3.      By prominently labeling the products as "non-drowsy" and "daytime," Defendant led Plaintiffs and other consumers to believe that the Non-Drowsy Products do not cause drowsiness, and that drowsiness is not a side effect of the products.

4.      Defendant also led Plaintiffs and other consumers to believe that the Non-Drowsy Products are for use during the "Daytime" and intended to be used during waking hours.

5.      However, one of the active ingredients in the Non-Drowsy Products is Dextromethorphan Hydrobromide ("DM HBr").  While the average consumer may not be aware, drowsiness is a documented side effect of DM HBr at dosages recommended by Defendant in respect to the Non-Drowsy Products. Authorities such as the National Library of Medicine and Mayo Clinic list drowsiness as a side effect of this ingredient.[2]

---

[2] Dextromethorphan: MedlinePlus Drug Information, National Library of Medicine, https://medlineplus.gov/druginfo/meds/a682492.html (last accessed March 23, 2022);

6.      Plaintiffs and Class members purchased the Non-Drowsy Products with the expectation that the products would not cause drowsiness and that they were intended to be used during waking hours. Because Defendant sold products to consumers that cause drowsiness, Plaintiffs and the Class members were deprived of the benefit of their bargain.

7.      Accordingly, Plaintiffs bring this action on behalf of themselves and the Class for equitable relief and to recover damages and restitution for: (i) violations of the Idaho Consumer Protection Act (Idaho Code § 48-601, *et seq*.); (ii) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2, *et seq*.); (iii) unjust enrichment; (iv) negligent misrepresentation; and (v) intentional misrepresentation.

## PARTIES

8.      Plaintiff Jennifer Stephens is a resident and citizen of the state of Idaho. Beginning in or around 2019, approximately once or twice per year, Plaintiff Stephens purchased Up & Up Daytime Cold and Flu from a Target Retail store in Boise, Idaho. When purchasing the Non-Drowsy Products, Plaintiff Stephens reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the "non-drowsy" "Daytime" products would not cause drowsiness and could be used during the day. Plaintiff Stephens relied on these representations and warranties in deciding to purchase the Non-Drowsy Products and these representations and warranties were part of the basis of the bargain in that she would not

---

*Mayo Clinic, Drugs and Supplements Dextromethorphan (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/dextromethorphan-oral-route/side-effects/drg-
20068661?p=1 (last accessed March 23, 2022).

have purchased the Non-Drowsy Products if she had known that they would cause drowsiness. When Plaintiff Stephens took the medication as directed by Defendant, she became unexpectedly drowsy.  Plaintiff Stephens was not on any other medication that would have caused drowsiness, and there was no other potential cause for this drowsiness, aside from the ingredients in the medication.  Plaintiff Stephens would purchase the Non-Drowsy Products again if they were actually "non-drowsy" (i.e., if the product was sold as advertised).  Plaintiff Stephens, however, faces an imminent threat of harm because she will not be able to rely on the labels in the future, and thus will not be able to purchase the products.

9.      Plaintiff James Bruno is a resident and citizen of the state of Illinois. Beginning in or around 2019, Plaintiff Bruno purchased Non-Drowsy Products, including Up & Up Daytime Cold and Flu and Up & Up Daytime Cold and Flu / Nighttime Cold and Flu combo packs, multiple times per year, from the Target retail store located in Mundelein, Illinois.   When purchasing the Non-Drowsy Products, Plaintiff Bruno reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the "non-drowsy" "Daytime" products would not cause drowsiness and could be used during the day. Plaintiff Bruno relied on these representations and warranties in deciding to purchase the Non-Drowsy Products and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Non-Drowsy Products if he had known that they would cause drowsiness. When Plaintiff Bruno took the medication as directed by Defendant, he became unexpectedly drowsy.  Plaintiff Bruno was not on any other medication that would

have caused drowsiness, and there was no other potential cause for this drowsiness, aside from the ingredients in the medication.  Plaintiff Bruno would purchase the Non-Drowsy Products again if they were actually "Non-Drowsy" (i.e., if the product was sold as advertised).  Plaintiff Bruno, however, faces an imminent threat of harm because he will not be able to rely on the labels in the future, and thus will not be able to purchase the products.

10.     Target is a Minnesota corporation with its principal place of business and headquarters located at 900 Nicollet Mall, Minneapolis, Minnesota. Target was founded in 1902 in Minneapolis, Minnesota by George Dayton and is one of the largest retailers in the world.  At all relevant times hereto, Defendant was engaged in manufacturing, marketing, distributing, and advertising Non-Drowsy Products throughout the United States. Defendant created and/or authorized the false and misleading advertising and labeling of the Non-Drowsy Products.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from the Defendant.

12.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in Minnesota, regularly conducts business in this District, and has extensive contacts with this forum.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is headquartered in this District, and Defendant transacts substantial business in this District.

## FACTUAL ALLEGATIONS

**A.     Defendant Manufactures, Distributes, Markets, and Sells the Non-Drowsy Products**

14.     Defendant manufactures, distributes, markets, and sells the Non-Drowsy Products.

15.     Each of the Non-Drowsy Products prominently state on its label that the product is "non-drowsy" and some also include the representation that the product is intended for "daytime" use.

16.     For example, below is an image of the Up & Up Cough and Chest Congestion DM with Honey – Maximum Strength's product label.



17.    The Up & Up Cold & Flu Daytime product label includes "non-drowsy" and "daytime" representations.



18.     The Non-Drowsy Products are also sold in combo packs with "nighttime" products. For example, below is an image of the Target Daytime Severe Cold & Flu combo pack which includes "daytime" and "nighttime" formulations.



19.     The "nighttime" product includes the representation that the product is for "nighttime relief" whereas the Daytime product includes the "non-drowsy" representation.

20.     Both products contain DM HBr, the ingredient in the Non-Drowsy Products that causes drowsiness.

21.     The "non-drowsy" and "daytime" representations are materially the same across the Non-Drowsy Products.

22.    Based on the prominent "non-drowsy" and "daytime" representations included on the front of each product, a reasonable consumer would believe that the products do not cause drowsiness and that drowsiness is not a side effect of the product.

**B.    Defendant's False and Misleading Advertising Campaign**

23.    One of the active ingredients in the Non-Drowsy Products is DM HBr.

24.    Drowsiness is a well-documented side effect of DM HBr.

25.    For example, the Mayo Clinic and the National Library of Medicine list drowsiness as a side-effect of the ingredient.[3]

26.    Manufacturers and distributors know that DM HBr causes drowsiness as their safety data sheets ("SDS") explicitly state that DM HBr causes and may cause drowsiness.

27.    According to Pfizer's safety datasheet for their Robitussin cough medicine. "Common adverse reactions associated with the clinical use of dextromethorphan hydrobromide include, drowsiness, dizziness, and nausea and vomiting".[4]

---

[3] *Dextromethorphan: MedlinePlus Drug Information, National Library of Medicine*, https://medlineplus.gov/druginfo/meds/a682492.html (last accessed March 23, 2022); *Mayo Clinic, Drugs and Supplements Dextromethorphan (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/dextromethorphan-oral-route/side-effects/drg-
20068661?p=1 (last accessed March 23, 2022).
10 Dextromethorphan: MedlinePlus Drug Information, National Library of Medicine, https://medlineplus.gov/druginfo/meds/a682492.html (last accessed March 23, 2022).
[4]            *Pfizer,           Safety           Data           Sheet*, https://imgcdn.mckesson.com/CumulusWeb/Click_and_learn/SDS_9PFIZ_ROBITUSSI N_DM_SYRP_ADLT_COUGH_CHEST_HONEY_4OZ.pdf (last accessed March 23, 2022).

28.     Santa Cruz Biotechnology Inc. lists acute health effects on their SDS following the consumption of DM HBr such as "Drowsiness, dizziness, excitation, mental confusion and gastro-intestinal disturbances have been described following dextromethorphan. Administration."[5]

29.     Peer-reviewed studies have also confirmed that drowsiness is a side effect of DM HBr at the recommended dosages.  For example, one study found that "[s]omnolence is a common side effect of centrally acting antitussive drugs" like DM HBr, and that 10.4% of users of products containing DM HBr develop drowsiness within three days of starting treatment with DM HBr cough medicine. [6, 7] The "cases of intense somnolence" were "related only to dextromethorphan" and not to the other drug studied.  And the patients in this clinical study were given an even smaller dosage of DM HBr (15 mg three times a day) than the recommended dose found in Non- Drowsy products.[8]

30.     In other words, sedation is a well-known adverse event of this ingredient.[9]

---

[5]     Dextromethorphan    Hydrobromide,    Material    Safety    Data    Sheet, https://datasheets.scbt.com/sc-204716.pdf (last accessed March 23, 2022).

[6] E. Catena and L. Daffonchio, "Efficacy and Tolerability of Levodropropizine in Adult Patients with Non-productive Cough, Comparison with Dextromethorphan," 10 Pulmonary Pharmacology & Therapeutics 89-96 (1997).

[7] The study reports this side effect as "somnolence." Somnolence means "the quality or state    of    being    drowsy."    Merriam    Webster    Dictionary, https://www.merriamwebster.com/dictionary/somnolence

[8] For example, Up & Up cold and flu daytime severe softgels contain 10mg of DM HBr per softgel and the recommended dosage is 2 softgels (20mg of DM HBr) every 4 hours.

[9] *See* Martin, E., Narjoz, C., Decleves, X., Labat, L., Lambert, C., Loriot, M. A., ... & Pickering, G. (2019). Dextromethorphan analgesia in a human experimental model of hyperalgesia. *Anesthesiology*, *131*(2), 356-368; *see also* Siu, A. and Drachtman, R. (2007), Dextromethorphan: A Review of N-methyl-d-aspartate Receptor Antagonist in the Management of Pain. CNS Drug Reviews, 13: 96-106. https://doi.org/10.1111/j.1527-3458.2007.00006.x ("DM is used clinically in the form of salt, dextromethorphan

31.    In fact, the Federal Aviation Administration prohibits pilots from flying after taking medicines that contain dextromethorphan. The document titled, "What Over-the-Counter (OTC) medications can I take and still be safe to fly" lists DayQuil as a "No Go" product because it contains dextromethorphan.[10]  The Non-Drowsy Products and DayQuil both contain this ingredient.   Specifically, the Non-Drowsy Products are compared to DayQuil on the front panel of the product labels.



---

hydrobromide…The majority of DM's adverse effects occur at the level of the CNS. Neurologic toxicity associated with DM includes dystonia, fatigue, drowsiness, and dizziness".).

[10] *Federal Aviation Administration, What Over-the-Counter (OTC) medications can I take and still be safe to fly* https://www.faa.gov/licenses_certificates/medical_certification/media/OTCMedicationsforPilots.pdf (last accessed March 23, 2022).

32.     The Non-Drowsy Products do not qualify the voluntary deceptive statements "non-drowsy" and "Daytime" with a disclaimer or qualification anywhere on the packaging; in other words, they do not disclose anywhere on the packaging that even though the Non-Drowsy Products affirmatively claim to be "non-drowsy" and "daytime," they actually do or can cause drowsiness, or that drowsiness is a side effect.  Accordingly, there is nothing on the packaging that could possibly cure or ameliorate the deception caused by the affirmative "non-drowsy" and "Daytime" representations.[11]

33.     As such, Defendant's advertising campaign is false and misleading.

34.     The Food and Drug Administration ("FDA") prohibits labeling drugs with "false or misleading" statements. 21 C.F.R. § 201.6. It is misleading to label a product "non-drowsy" when it does cause drowsiness, or if drowsiness is a known side effect of one of its active ingredients.

35.     This case is about Defendant's affirmative, "non-drowsy" representation on the Non-Drowsy Product labels.  No FDA regulation allows antitussives containing DM HBr to be labelled "non-drowsy" and the FDA has never considered whether this claim is false and misleading.

36.     Based on the fact that Defendant labelled the Non-Drowsy Products as "non-drowsy," a reasonable consumer would expect that those products do not cause drowsiness. Similarly, a reasonable consumer would expect that drowsiness is not a side effect of the

---

[11] To be clear, Plaintiffs do not contend that Defendant has a duty to warn that its products cause drowsiness in the absence of any affirmative misrepresentation; they contend that it is deceptive to affirmatively label the Non-Drowsy Products "non-drowsy" and "daytime."

products.   Indeed, according to Consumer Reports, "'Non-drowsy' is code for antihistamines and other medications that don't make you sleepy."[12]   This is the plain meaning of "non-drowsy," which means "not causing or accompanied by drowsiness."

37.   While the Federal Regulations relating to the labelling of antitussive drug products do not require products with DM HBr to include an affirmative "drowsiness" warning, *see generally*, 21 C.F.R. § 341.74, Defendant could have simply omitted the false and misleading "non-drowsy" representations from its product labels.

38.   Other drug makers do not falsely claim that products that include DM HBr are "non-drowsy."   For example, Coricidin is a cold symptom relief product for people with high blood pressure.   Coricidin is manufactured, sold, and advertised by Bayer. This product contains DM HBr and omits false representations by not labeling the product as "non-drowsy."

---

[12]   How to read over the counter (OTC) drug labels, Consumer Reports, https://www.consumerreports.org/cro/2014/04/how-to-read-over-the-counter-druglabels/index.htm



39.     Or, if Defendant wanted to differentiate its Daytime products from its Nighttime products, it could have indicated on the product label that the Daytime products would cause *less* drowsiness than the Nighttime products.   For example, the below Dramamine product is advertised as a "less drowsy" formula.



40.     Whether or not an over-the-counter drug causes drowsiness is material to a reasonable customer.  In certain situations, consumers prefer over-the-counter drugs that will not make them drowsy to products that may make them drowsy.  For example, all else equal, a reasonable consumer would prefer to take a drug that does not cause drowsiness to one that does cause drowsiness during the day (or any periods of time when they plan to be awake).  As a second example, if a consumer is planning to engage in activities that require them to be alert, or during which they would prefer to be alert, that consumer would prefer to take a drug that does not cause drowsiness to one that does.  Indeed, in many situations, taking a drug that does or can cause drowsiness can be dangerous.  For example, taking a drug that causes drowsiness while driving is dangerous.

41.     Because Defendant makes and sells the Non-Drowsy Products, Defendant researched the known and common side effects of DM HBr.  This is diligence that a large company like Defendant would do when selling a drug.  As a result, Defendant knew that DM HBr causes drowsiness.  Furthermore, Defendant controls its labeling, knowingly put on the "non-drowsy" representations, and knows the plain meaning of "non-drowsy." Finally, it is standard practice in the industry to test labeling with consumers, and Defendant's testing would confirm that "non-drowsy" is misleading.  For these reasons, Defendant knew that its labeling was false and misleading, or was reckless or willfully blind to this fact.  And as alleged above, Defendant intended that consumers would rely on the "non-drowsy" labeling, so that consumers would purchase more products and pay a price premium.

42.     Defendant's false statements increased the demand for its Non-Drowsy Products and allowed Defendant to charge a price premium.  As explained above, consumers specifically value the "non-drowsy" claim because consumers demand cough medicine that will not make them drowsy (e.g., during the day, at work or while driving). As a result, Defendant was able to charge more for these products than it would have been able to had the labeling been truthful.  Accordingly, as a direct result of Defendant's false statements, Defendant was able to charge a price premium for these products.  As purchasers, Plaintiffs and each class member paid this price premium and sustained economic injury.

43.     For example, a bottle of the Up & Up cold and flu daytime severe product is currently priced at $7.49 for a 24 softgels on Target's website.  This price is artificially inflated by the misleading "non-drowsy" claim.  If this misleading claim were removed, demand would drop, which in turn would reduce the market price.  This price premium can be quantified (*i.e.*, a dollar figure measured) using expert economic analysis of data that includes, among other things, sales and pricing information uniquely within the possession of Defendant.

44.     In addition, because the Non-Drowsy Products actually do cause drowsiness, Plaintiffs and each class member did not get what they paid for: a cough medicine that does not cause drowsiness.  Instead, they received something that is worth less: a cough medicine that does cause drowsiness.  Plaintiffs and each class member sustained an economic injury for this additional reason, i.e., they received something worth less than the price they paid for it.

45.     As a result, the products that Plaintiffs and each class member did receive in exchange for the price they paid—Non-Drowsy Products that cause drowsiness—were not suitable for, and were thus worthless for, their intended purpose.  Therefore, the economic injury Plaintiffs and each class member sustained consists of the entire purchase price of the products, because what they received was worthless for its intended use.

46.     Defendant intended that consumers would rely on the "non-drowsy" and "daytime" labeling so that consumers would purchase more products, pay a price premium, and buy them as alternatives to its "nighttime" products.  The product labels do not warn consumers that even though the products are labelled "non-drowsy" and "daytime," contrary to those representations, the products cause drowsiness, may cause drowsiness, or you may get drowsy from the usage of such products thereby creating an unreasonable risk of harm as a result of the affirmative deceptive "non-drowsy" and "daytime" statements, which are not qualified anywhere on the packaging.

**C.**     **Consumers Have Been Harmed By Defendant's False Representations**

47.     Defendant knew, or should have known, that Defendant's Non-Drowsy Products are misbranded because they contain DM HBr which causes drowsiness in consumers.

48.     Defendant knew, or should have known, that its products misrepresented material facts concerning the "non-drowsy" and "daytime" representations when in fact the products contained an ingredient that causes drowsiness.

49.    Defendant knew, or should have known, that the representations and statements through its labeling prescribes dangerous uses.

50.    Plaintiffs would not have purchased the Non-Drowsy Products, or would have paid less for them, had the Non-Drowsy Products been truthfully and accurately labeled.

## CLASS ACTION ALLEGATIONS

51.    Plaintiffs bring this action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of the following Classes:

> All persons who purchased one or more of Defendant's Non-Drowsy Products in the United States for personal/household use within any applicable limitations period (the "Nationwide Class").

52.    Plaintiff Stephens brings this action individually and on behalf of the following Idaho subclass:

> All persons who purchased one or more of Defendant's Non-Drowsy Products in the state of Idaho for personal/household use within any applicable limitations (the "Idaho Subclass").

53.    Plaintiff Bruno brings this action individually and on behalf of the following Illinois subclass:

> All persons who purchased one or more of Defendant's Non-Drowsy Products in the state of Illinois for personal/household use within any applicable limitations (the "Illinois Subclass").

54.    Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or

former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the Non-Drowsy Products.

55.     Numerosity (Rule 23(a)(1)): The exact number of members of the Class is unknown and currently unavailable to Plaintiffs, but joinder of individual members herein is impractical. The Class is likely comprised of thousands of consumers. The precise number of Class members, and their addresses, is unknown to Plaintiffs at this time, but can be ascertained from Defendant's records and/or retailer records. The members of the Class may be notified of the pendency of this action by mail or email, Internet postings and/or publications, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

56.     Predominant Common Questions (Rule 23(a)(2) and (b)(3)): The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. The common and legal questions include, but are not limited to, the following:

     a.   Whether the Non-Drowsy Products cause drowsiness;

     b.   Whether Defendant's labelling of the Non-Drowsy Products as "non-drowsy" and "daytime" is false, misleading, and/or deceptive;

     c.   Whether Defendant violated the state consumer protection statutes alleged herein;

     d.   Whether Defendant was unjustly enriched; and

     e.   The nature of relief, including damages and equitable relief, to which Plaintiffs and members of the Class are entitled.

57.     Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all other Class Members, purchased the Non-Drowsy Products, suffered damages as a result of that purchase, and seek the same relief as the proposed Class members.

58.     Adequacy of Representation (Rule 23(a)(4)): Plaintiffs adequately represent the Class because their interests do not conflict with the interests of the members of the Class, and they have retained counsel competent and experienced in complex class action and consumer litigation. Plaintiffs and their counsel will fairly and adequately protect the interest of the members of the Class.

59.     Superiority (Rule 23(b)(3)): A class action is superior to other available means of adjudication for this controversy. It would be impracticable for members of the Class to individually litigate their own claims against Defendant because the damages suffered by Plaintiffs and the members of the Class are relatively small compared to the cost of individually litigating their claims. Individual litigation would create the potential for inconsistent judgments and delay and expenses to the court system. A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

60.     Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)): In the alternative, this action may properly be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for the Defendant; or the prosecution of separate actions

by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

## **CAUSES OF ACTION**

## **COUNT I**

### **VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT**
### **Idaho Code § 48-601, *et seq*.**
### **(On Behalf of Plaintiff Stephens and the Idaho Subclass)**

61.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

62.     Defendant is a "person" as defined by Idaho Code § 48-602(1).

63.     Defendant's conduct as alleged herein pertained to "goods" as defined by Idaho Code § 48-602(6).

64.     Defendant advertised, offered, or sold goods in Idaho and engaged in trade or commerce directly or indirectly affecting the people of Idaho.

65.     Defendant engaged in unfair and deceptive acts or practices, and unconscionable acts and practices, in the conduct of trade and commerce with respect to the sale and advertisement of the Non-Drowsy Products, in violation of Idaho Code §§ 48-603, including representing that the Non-Drowsy Products do not cause drowsiness,

and are intended to be used during waking hours, when in fact, the products do cause drowsiness.

66.     As a result of engaging in such conduct, Defendant has violated Idaho Code §§ 48-603(5)(7), and (9).

67.     Defendant's representations were material because they were likely to deceive reasonable consumers.

68.     Defendant intended to mislead Plaintiff Stephens and Idaho Subclass members and induce them to rely on its misrepresentations. Defendant knew its representations were false at the time they were made.

69.     Defendant acted intentionally, knowingly, and maliciously to violate Idaho's Consumer Protection Act, and recklessly disregarded Plaintiff Stephens' and Idaho Subclass members' rights. Defendant's knowledge of the ingredients used in its products put it on notice that the Non-Drowsy Products were not as it advertised.

70.     As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Stephens and absent Idaho Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Non-Drowsy Products.

71.     Plaintiff Stephens and Idaho Subclass members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, injunctive relief, costs, and attorneys' fees.

## COUNT II

**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT
815 Ill. Comp. Stat. §§ 505, *et seq.*
(On Behalf Plaintiff Bruno and the Illinois Subclass)**

72.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

73.     Plaintiff Bruno and Illinois Subclass members are consumers under the Illinois Consumer Fraud Act and Defendant is a "person" within the meaning of 815 Ill. Comp. Stat. 510/1(5).

74.     Defendant engaged, and continues to engage, in the wrongful conduct alleged herein in the course of trade and commerce, as defined in 815 ILCS 505/2 and 815 ILCS 510/2.

75.     Specifically, 815 ILCS 505/2 (Illinois Consumer Fraud Act) prohibits:

> [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act,' approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the

Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

76.     815 ILCS 510/2 provides that a:

person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; ... (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have...; (7) represents that goods or services are of a particular standard, quality, or grade... if they are not; ... [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

77.     Defendant's representations concerning the true nature of Defendant's Non-Drowsy Products were false and/or misleading as alleged herein.

78.     Defendant's foregoing deceptive acts and practices were likely to deceive, and did deceive, consumers acting reasonably under the circumstances. Consumers, including Plaintiff Bruno and Illinois Subclass members, would not have purchased the Non-Drowsy Products had they known the products contained an ingredient that has a side effect of drowsiness. These claims, alone or in tandem, are deceptive.

79.     Defendant's false or misleading representations were such that a reasonable consumer would attach importance to them in determining his or her purchasing decision.

80.     Defendant's false and misleading representations were made to the entire Illinois Subclass as they were prominently displayed on the packaging of every one of the Non-Drowsy Products and on Defendant's website.

81.     Defendant knew or should have known its representations were material and were likely to mislead consumers, including Plaintiff Bruno and the Illinois Subclass.

82.     Defendant's practices, acts, and course of conduct in marketing and selling the Non-Drowsy Products were and are likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment.

83.     Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised the Non-Drowsy Products to unwary consumers.

84.     Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the Illinois Consumer Fraud Act.

85.     Defendant's wrongful business practices were a direct and proximate cause of actual harm to Plaintiff Bruno and to each Class member.

86.     As a direct and proximate result of Defendant's unfair and deceptive trade practices, Plaintiff Bruno and the other Illinois Subclass members have suffered ascertainable loss and actual damages. Plaintiff Bruno and the other Illinois Subclass members who purchased the Non-Drowsy Products would not have purchased them, or, alternatively, would have paid less for them had the truth about the non-conforming ingredients been disclosed. Plaintiff Bruno and the other Illinois Subclass members did not receive the benefit of their bargain. Plaintiff Bruno and the other Illinois Subclass members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under 815 Ill Comp. Stat. 505/1, *et seq.*

## COUNT III

### UNJUST ENRICHMENT
### (On behalf of the Plaintiffs and the Nationwide Class or, alternatively, the Idaho and Illinois Subclasses)

87.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

88.     Plaintiffs and Class members conferred benefits upon Defendant. Plaintiffs and Class members paid money for Defendant's Non-Drowsy Products that they would not have paid, had they known that the products cause drowsiness.

89.     Defendant has unjustly retained the benefits conferred upon by Plaintiffs and Class members.

90.     Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits. Specifically, Defendant retained those benefits even though Defendant's Non-Drowsy Products cause drowsiness. If Plaintiffs and Class members had known the true nature of Defendant's Non-Drowsy Products, they would not have purchased the products. Plaintiffs and Class members are therefore entitled to disgorgement and/or restitution as prayed for hereunder.

91.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and members of the Class for its unjust enrichment, as ordered by the Court.

## COUNT IV

**NEGLIGENT MISREPRESENTATION**
**(On behalf of the Plaintiffs and the Nationwide Class or, alternatively, the Idaho and Illinois Subclasses)**

92.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

93.     Plaintiffs bring this claim against Defendant on behalf of themselves and the proposed Class.

94.     Defendant has made material misrepresentations of fact concerning the nature of, and ingredients in, the Non-Drowsy Products to Plaintiffs and the Class.

95.     Defendant has and had no reasonable basis for believing that their misrepresentations were true.

96.     Defendant knew, or should have known, that Plaintiffs and the members of the Class would rely on the false representations about the nature of, and ingredients in, the Non-Drowsy Products.

97.     Defendant's false representations about the ingredients of the Non-Drowsy Products are objectively material to reasonable consumers, and therefore reliance upon such representations may be presumed as a matter of law.

98.     Plaintiffs and members of the Class have read and reasonably relied to their detriment on Defendant's false and misleading representations, which caused them to purchase the Non-Drowsy Products.

99.     As a proximate result of Defendant's negligent misrepresentations, Plaintiffs and each member of the Class have been damaged in the amount of the purchase price of

the Non-Drowsy Products and any consequential damages resulting from their purchases, including sales tax.

## COUNT V

### INTENTIONAL MISREPRESENTATION
**(On behalf of the Plaintiffs and the Nationwide Class or, alternatively, the Idaho and Illinois Subclasses)**

100.   Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

101.   Defendant has intentionally made material misrepresentations of fact concerning the nature of, and ingredients in, the Non-Drowsy Products to Plaintiffs and the Class.

102.    Defendant knew that the intentional misrepresentations herein were false at the time they were made.

103.   Defendant intended that Plaintiffs and members of the Class would rely on the false representations and purchase Defendant's Non-Drowsy Products.

104.   Defendant's false representations are objectively material to reasonable consumers and therefore reliance upon such representations may be presumed as a matter of law.

105.   Plaintiffs and members of the Class reasonably relied to their detriment on Defendant's intentional misrepresentations.

106.   Defendant's intentional misrepresentations were a substantial factor in causing Plaintiffs and members of the Class to purchase the Non-Drowsy Products.

107. Defendant has acted with malice by engaging in conduct that was and is intended to cause injury to Plaintiffs and the members of the Class.

108. Defendant has committed fraud through their intentional misrepresentations, deceit, and/or concealment of material facts known to Defendant with the intent to cause injury to the purchasers of the Non-Drowsy Products.

109. As a proximate result of Defendant's intentional misrepresentations, Plaintiffs and the members of the Class suffered an ascertainable loss and are entitled to relief and compensatory and punitive damages, as allowable by law, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray for relief and judgment against Defendant as follows:

a.  Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

b.  Awarding Plaintiffs and the Classes compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

c.  Awarding Plaintiffs and the Classes appropriate relief, including but not limited to actual damages;

d.  For declaratory and equitable relief, including restitution and disgorgement;

e.  For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

f.  Awarding Plaintiffs and the Classes the costs of prosecuting this action, including expert witness fees;

g.  Awarding Plaintiffs and the Classes reasonable attorneys' fees and costs as allowable by law;

h.  Awarding pre-judgment and post-judgment interest;

i.  For punitive damages as allowable by law; and

j.  Granting any other relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury of all claims so triable.

Dated: June 15, 2022                   **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

By: /s Robert K. Shelquist
     Robert K. Shelquist, #21310X
     Rebecca A. Peterson, #392663
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Telephone: 612-339-6900
Email: rkshelquist@locklaw.com
Email: rapeterson@locklaw.com

Mark S. Reich (*pro hac vice* to be filed)
Courtney E. Maccarone (*pro hac vice* to be filed)
**LEVI & KORSINSKY, LLP**
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212-363-7500
Email: mreich@zlk.com
Email: cmaccarone@zlk

Nick Suciu III (*pro hac vice* to be filed)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: 313-303-3472
Email: nsuciu@milberg.com

Gary M. Klinger(*pro hac vice* to be filed)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: 866.252.0878
Email: gklinger@milberg.com

**Counsel for Plaintiffs**