UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JENNIFER STEPHENS, JAMES BRUNO,          Case No. 22-CV-1576 (PJS/DTS)
and KRYSTAL LOPEZ,

　　　　　　　　Plaintiffs,

　　　　　　　　　　　　　　　　　ORDER

v.

TARGET CORPORATION,

　　　　　　　　Defendant.

---

　　　　Jonas Jacobson and Simon Franzini, DOVEL & LUNER; and Brittany Scott,
　　　　BURSOR & FISHER P.A., for plaintiffs.

　　　　Michael Kevin Underhill, SHOOK, HARDY, & BACON, L.L.P., for
　　　　defendant.

　　　　Plaintiffs Jennifer Stephens, James Bruno, and Krystal Lopez purchased Up & Up

cold-and-flu medicine from defendant Target Corporation ("Target"). The medicine

was labeled as "non-drowsy," but soon after using it, plaintiffs felt drowsy. Plaintiffs

filed this putative class action accusing Target of misleading them. Target now moves

to dismiss plaintiffs' claims under Fed. R. Civ. P. 12(b)(6). For the reasons that follow,

the Court grants Target's motion as to the unjust-enrichment claim in Count III and

Stephens's breach-of-contract claim in Count X, and denies the motion in all other

respects.

## I. BACKGROUND

### A. Plaintiffs' Claims

Target markets over-the-counter ("OTC") cold-and-flu products under its private Up & Up label. Am. Compl. ¶¶ 1, 5. Many of those products contain the antitussive (cough suppressant) dextromethorphan hydrobromide ("DMH"). *Id.* Target often labels medication containing DMH as "daytime" or "non-drowsy," and sometimes sells the medication in a "combo pack" featuring orange pills for daytime use and green pills for nighttime use. *Id.* ¶¶ 15–21.

Plaintiffs allege that these "non-drowsy" and "daytime" representations are false because DMH does in fact cause drowsiness. *Id.* ¶¶ 24–32. Plaintiffs base this allegation on their personal experiences and a few other things: a peer-reviewed study finding a link between DMH and drowsiness, *id.* ¶ 29; a safety-data sheet issued by the Occupational Safety and Health Administration ("OSHA") with respect to Robitussin cough medicine stating that a common reaction to using DMH is drowsiness, *id.* ¶ 28; web pages associated with the Mayo Clinic and the National Library of Medicine advising DMH users to talk to a doctor if they experience drowsiness, *id.* ¶ 26; and a Federal Aviation Administration ("FAA") guidance manual advising pilots not to fly after using drugs containing DMH. *Id.* ¶ 30.

All of plaintiffs' claims against Target arise under state law.  Plaintiffs allege violations of California, Idaho, and Illinois consumer-protection laws, *see id.* ¶¶ 61–86, 110–146, and assert claims for unjust enrichment, *id.* ¶¶ 87–91, negligent and intentional misrepresentation, *id.* ¶¶ 92–109, breach of express warranty, *id.* ¶¶ 147–53, and breach of contract.  *Id.* ¶¶ 154–62.  Plaintiffs seek both monetary and injunctive relief.  *See id.* at 37–38.

Target has moved to dismiss plaintiffs' claims under Fed. R. Civ. P. 12(b)(6), primarily based on the argument that all of the claims are expressly preempted by federal law.  Target also argues that plaintiffs have not plausibly alleged that its drug labeling is false or misleading, that plaintiffs' contract and warranty claims must be dismissed for failure to provide adequate pre-suit notice, and that plaintiffs have not pleaded facts entitling them to recover for unjust enrichment or to receive injunctive relief.

## B. Federal Regulation of OTC Antitussive Drugs

The Food and Drug Administration ("FDA") regulates the sale of OTC drugs pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.* The FDA regulates OTC drugs primarily by issuing what it refers to as "monographs," which are detailed regulations setting forth a series of conditions under which specific drugs may qualify as safe, effective, and not misbranded when sold over the counter.

*See* 21 C.F.R. §§ 330.1, 330.10.  By providing something "[l]ike a recipe" for selling an

OTC drug, the monograph system saves the FDA from having to individually evaluate

every OTC drug sold in the United States.  *Nat'l Res. Def. Council, Inc. v. U.S. Food &*

*Drug Admin.*, 710 F.3d 71, 75 (2d Cir. 2013).  Instead, the FDA sets out a series of general

rules that apply to all OTC drugs, *see* 21 C.F.R. § 330.1, and then promulgates

monographs containing additional rules that apply to various therapeutic categories

(e.g., antacids or nighttime sleep aids, *see* 21 C.F.R. Ch. I, Subch. D, Pts. 331–358).  The

monograph for each therapeutic category lists the drugs that may be sold over the

counter within that category, and then sets out dosage and labeling requirements for

each drug, including the precise language that must be used to describe each drug's

indications and the precise warnings that must accompany each drug.  *See id.*

     The monograph governing OTC antitussives—which also addresses other cold,

cough, allergy, bronchodilator, or antiasthmatic drug products—is codified at 21 C.F.R.

§ 341.  As relevant here, § 341 requires a drowsiness warning for certain antitussive

drugs (diphenhydramine citrate and diphenhydramine hydrochloride), but *not* for

DMH.  *See id.* § 341.74(c)(4).  The monograph neither requires nor forbids a "non-

drowsy" label for products containing DMH; the monograph is simply silent on the

matter.  *See generally id.*

-4-

The notice-and-comment process for promulgating the monograph governing antitussives took 15 years and involved extensive review of scientific data by both the FDA and a panel of expert advisors.  *See generally, e.g.,* Over-the-Counter Drugs; Proposal Establishing Rule Making Procedures for Classification, 37 Fed. Reg. 85 (Jan. 5, 1972); Over-the-Counter Drugs; Establishment of a Monograph for OTC Cold, Cough, Allergy, Bronchodilator and Antiasthmatic Products, 41 Fed. Reg. 38,312 (Sept. 9, 1976); Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use; Tentative Final Monograph for OTC Antitussive Drug Products, 48 Fed. Reg. 48,576 (Oct. 19, 1983); Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use; Final Monograph for OTC Antitussive Drug Products, 52 Fed. Reg. 30,042 (Aug. 12, 1987).

In the thousands of pages comprising the monograph's rulemaking history, the only substantive discussion of DMH and drowsiness appears in the context of the FDA's evaluation of a claim that an antitussive helps a user to sleep by quieting a disruptive cough.  *See* 48 Fed. Reg. at 48,589.  In the course of evaluating that claim, the FDA recognized "that there might be a secondary pharmacological action of an antitussive, tantamount to a sedative effect, that helps an individual to sleep."  *Id.*  But while acknowledging scientific literature that "describes slight drowsiness as a side effect for . . . dextromethorphan preparations," the FDA stated that it was "not aware of

data demonstrating" that DMH could be classified as a nighttime sleep aid or that it required a drowsiness warning. *Id.* The agency therefore determined that "sleep-aid claims directly related to the ability of an antitussive ingredient to cause drowsiness . . . will remain in Category III," *id.*—meaning that the FDA did not have sufficient data to evaluate such claims. *See* 21 C.F.R. § 330.10(a)(5)(iii).[1]

Section 502 of the FDCA provides that a drug is misbranded in violation of the statute "[i]f its labeling is false or misleading in any particular." 21 U.S.C. § 352(a)(1). This prohibition on false or misleading labeling is one of the FDA's general conditions that apply to all OTC drugs. *See* 21 C.F.R. § 330.1(c) (requiring that "[t]he product is labeled in compliance with chapter V of the Federal Food, Drug, and Cosmetic Act" and specifying that any alternative labeling regarding indications shall be "subject to the provisions of section 502 of the act"). The monograph governing antitussives expressly incorporates this and all of the other general conditions applicable to OTC drug sales. *See, e.g., id.* § 341.1(a) ("An over-the-counter cold, cough, allergy, bronchodilator, or antiasthmatic drug product in a form suitable for oral, inhalant, or topical administration is generally recognized as safe and effective and is not misbranded if it

---

[1]Before issuing the final antitussive monograph, the FDA stopped using the Category I–III nomenclature in response to *Cutler v. Kennedy*, 475 F. Supp. 838 (D.D.C. 1979). *See, e.g.*, 48 Fed. Reg. at 48,576–77.

meets each of the conditions in this part *and each of the general conditions established in § 330.1.*") (emphasis added).

## II.  ANALYSIS

### *A. Standard of Review*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *See Du Bois v. Bd. of Regents*, 987 F.3d 1199, 1202 (8th Cir. 2021).

Preemption is generally an affirmative defense, *see Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 886 (8th Cir. 2005), but a preemption defense may provide the basis for dismissal under Rule 12(b)(6) if the defense is "apparent on the face of the complaint," meaning "simply that the district court is limited to the materials properly before it on a motion to dismiss, which may include public records and materials embraced by the complaint." *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008) (citations omitted).  The party asserting preemption bears the burden of establishing it.

*Pharm. Care Mgmt. Assoc. v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021) (citing *Williams v. Nat'l Football League*, 582 F.3d 863, 880 (8th Cir. 2009)).

## B.  Plausibility

As a initial matter, the Court disagrees with Target's contention that plaintiffs have not plausibly alleged that the "non-drowsy" and "daytime" labels are false.  As described above, the complaint primarily relies on plaintiffs' experiences and four other sources for its contention that DMH causes drowsiness: a peer-reviewed study, an OSHA safety-data sheet for Robitussin cough medicine, two drug-fact web pages, and FAA pilot guidance.  Am. Compl. ¶¶ 26–30.  If plaintiffs do not come up with additional evidence, their claims may very well be dismissed on summary judgment.  But their allegation that DMH causes drowsiness is plausible, and that is all that is required at this stage of the litigation.

## C.  Preemption

The main thrust of Target's motion is that plaintiffs' claims are preempted by the FDCA.  "The general law of preemption is grounded in the Constitution's command that federal law 'shall be the supreme Law of the Land.'"  *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021 (8th Cir. 2015) (*quoting In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.*, 621 F.3d 781, 791 (8th Cir. 2010)).  "Congress can preempt state law in one of three ways: (1) expressly though statutory language like a

preemption clause; (2) implicitly when a state law 'conflict[s] with' or stands as an obstacle to federal law; or (3) implicitly by 'occup[ying] a legislative field,' leaving no room for state law."  *WinRed v. Ellison*, 59 F.4th 934, 941 (8th Cir. 2023) (*quoting Weber v. Heaney*, 995 F.2d 872, 875 (8th Cir. 1993)).  "Congressional intent is the touchstone for determining the preemptive effect of a statute."  *Wuebker*, 418 F.3d at 886.

Here, Target argues that plaintiffs' claims are expressly preempted by 21 U.S.C. § 379r(a), which is titled "National uniformity for nonprescription drugs," and which provides in relevant part:

> [N]o State or political subdivision of a State may establish or continue in effect any requirement—
>
> (1)    that relates to the regulation of a [nonprescription] drug . . . ; and
>
> (2)    that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter . . . .

The term "requirement" is not limited to statutory requirements, but is broad enough to encompass regulatory and common-law requirements.  *See Cipollone v. Liggett Grp.*, 505 U.S. 504, 521 (1992)).  In essence, states are free under § 379r(a) to impose and enforce their own OTC-drug requirements, so long as those requirements are substantively identical to what the FDA requires pursuant to the FDCA.

The parties largely agree about the scope of § 379r(a) preemption.  They agree that state law can provide "a damages remedy for claims premised on a violation of FDA regulations" because "the state duties in such a case 'parallel,' rather than add to, federal requirements."  *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330 (2008) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996)) (interpreting similar language in FDCA's medical-device preemption provision).  Similarly, they agree that state law can require a seller to remove a misleading statement from a drug label if the FDA has not addressed the subject of the statement.  *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 758 (9th Cir. 2015) (determining that similar preemption provision for cosmetics did not apply where FDA had "never issued regulations regarding the use of 'natural' on cosmetics labels").  On the flip side, they agree that state law cannot prohibit a statement on an OTC drug label that a monograph expressly authorizes, or require a warning or other statement that the applicable monograph does not require.  *Cf. In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1205 (8th Cir. 2010) (holding in medical-device context that potential additional warnings were "precisely the type of state requirement that is 'different from or in addition to' the federal requirement and therefore preempted" (quoting 21 U.S.C. § 360k)).

What the parties dispute, of course, is how § 379r(a) operates in this case, where the FDA studied the issue of whether antitussives cause drowsiness, but, in the text of

the applicable monograph, said nothing about DMH and drowsiness.  Although the

monograph does not mention—much less endorse—a "non-drowsy" or "daytime"

description for products containing DMH, Target argues that plaintiffs' claims are

nevertheless preempted by the monograph's regulatory history.  If the Court reviews

that history, Target says, the Court will discover that, after studying the issue of

whether antitussives cause drowsiness, the FDA required a drowsiness warning for

some antitussives but not for DMH.  In Target's view, this must mean that the FDA

found that DMH was non-drowsy.  Therefore, says Target, plaintiffs seek to use state

law to *forbid* Target from making a statement ("DMH does not cause drowsiness") that

the FDA implicitly *endorses*.  Plaintiffs' claims are therefore preempted by § 379r(a).

In support of its argument, Target cites *Goldstein v. Walmart, Inc.*, 22-CV-00088

(LJL), 2022 WL 16540837 (S.D.N.Y. Oct. 28, 2022), which held that § 379r(a) preempted

claims nearly identical to those brought by plaintiffs against Target.  *See id.* at *10.  As

the *Goldstein* court saw it, the FDA's antitussive monograph dealt "squarely with the

issue of whether [DMH] requires a drowsiness warning" because it required such

warnings for some drugs (and required antitussives containing DMH to carry other

warnings) but "tellingly did not require a warning on oral antitussives that contain

[DMH] that they may cause drowsiness."  *Id.* (citing 21 C.F.R. § 341.74(c)(4)).

Acknowledging that the monograph itself contained no mention of the phrase "non-

drowsy," *id.* at \*11, the *Goldstein* court nevertheless concluded after reviewing the rulemaking history that "the FDA considered Plaintiff's claim that [DMH] caused drowsiness and determined that insufficient data existed to support such a finding." *Id.* at \*10.  Based on that, the court decided that the plaintiff's state-law deception claims would impose labeling requirements that differed from the FDA's, and thus that those claims were preempted.

This Court respectfully disagrees with *Goldstein* and with Target's arguments. Again, for a state-imposed "requirement" to be preempted under § 379r(a), that requirement must differ in some respect from a "requirement" imposed under the FDCA.  It is thus important to identify exactly what "requirement" is imposed by state law and exactly how that "requirement" is said to differ from a "requirement" imposed under the FDCA.

In this case, plaintiffs do not seek to force Target to place a single word on the labels of products containing DMH.  Rather, they simply seek to hold Target liable for voluntarily *adding* misleading language to those labels.  This distinction was well explained by *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468 (7th Cir. 2020).  The plaintiffs in *Bell* brought state-law claims against two grocery-store chains, alleging that they deceived consumers  by selling containers of parmesan cheese marked "100% cheese," even though the containers included cellulose powder and potassium sorbate.  The

defendants moved to dismiss plaintiffs' claims as preempted by the FDCA under 21

U.S.C. § 343-1(a)(1), which forbids state food-labeling requirements that are "not

identical" to those issued by the FDA.  *Id.* at 483.  The applicable regulation was simply

silent on whether the labels on the parmesan-cheese containers could include the phrase

"100% cheese."  Defendants attempted to argue from that silence that any state-law

prohibition on the phrase would constitute a requirement that differed from those

imposed by the FDA.  *See id.*

In rejecting defendant's preemption argument, *Bell* emphasized the difference

between state-law claims seeking "to require that disclosure language be *added* to a food

label when federal regulations did not explicitly require it" and state-law claims seeking

"only to stop defendants from voluntarily adding deceptive language to the federally

permitted labels."  *Id.*  In the latter instance, the court reasoned, "[i]f state law prevents

such deception, it will not establish any new requirement different from" the FDA's

regulations, particularly given that "the FDCA already provides generally that 'a food

shall be deemed to be misbranded' if its labeling is 'false or misleading in any

particular.'"  *Id.* (quoting 21 U.S.C. § 343(a)(1)).  The court thus concluded that "[t]he

FDCA's preemption provision means that, while states may not require sellers to *add*

further labeling that is not required by federal law, they may prevent sellers from

voluntarily adding deceptive content that is not required by federal law."  *Id.*

Exactly the same can be said of plaintiffs' claims in this lawsuit.  Plaintiffs do not seek to force Target "to add further labeling that is not required by federal law."  *Id.* Instead, they seek to prevent Target "from voluntarily adding deceptive content that is not required by federal law."  *Id.*  Moreover, the state-law "requirement"—i.e., the requirement that Target not add deceptive content to its labels—is not a requirement "that is different from or in addition to, or that is otherwise not identical with, a requirement under [the FDCA]."  To the contrary, the FDCA prohibits false or misleading labeling, *see* 21 U.S.C. § 352(a)(1), which is exactly the prohibition that plaintiffs seek to enforce in this lawsuit.

As noted above, Target argues that the regulatory history of the applicable monograph shows that the FDA studied whether DMH causes drowsiness and that the FDA concluded that it does not, because otherwise the FDA would have required products containing DMH to warn of drowsiness.  But Target's approach suffers from at least two serious defects.  The first is that it would infect preemption analysis with all of the mischief and indeterminacy that comes with defining the scope of a statute or regulation by focusing not on what the statute or regulation actually says, but on legislative or regulatory history.  *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("If one were to search for an interpretive technique that, *on the whole*, was more likely to confuse than to clarify, one could hardly find a more promising

candidate than legislative history.").  Specifically, under Target's approach, a court would review thousands of pages of regulatory history, attempt to ascertain why an agency chose *not* to say anything about a topic in a regulation, and then attempt to imbue the agency's silence with preclusive effect.

And that leads to the second major problem with Target's approach:  It would bestow preemptive effect on agency action that lacks any force of law.  "Congressional and agency musings . . . do not satisfy the Article I, § 7, requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy Clause." *Wyeth v. Levine*, 555 U.S. 555, 587–88 (2009) (Thomas, J., concurring); *see also id.* at 602 (Thomas, J., concurring) ("[O]ur federal system in general, and the Supremacy Clause in particular, accords pre-emptive effect to only those policies that are actually authorized by and effectuated through the statutory text.").

In this case, the Court must assume, for purposes of ruling on Target's motion to dismiss, that Target's claim that products containing DMH do not cause drowsiness is false—i.e., that Target is misleading consumers.  Although the laws of every state forbid retailers to mislead consumers by including false statements on the labels of OTC drugs, Target would have this court declare such state laws to be preempted—and Target to be free to continue to mislead consumers—based on three tangentially relevant paragraphs found in a 40-year-old report accompanying a proposed (i.e., non-final) rule.  *See* 48 Fed.

-15-

Reg. 48,576, 48,589 (Oct. 19, 1983).[2]  To call three paragraphs of regulatory history a "requirement under this chapter" as used in § 379r(a) would stretch that phrase beyond recognition, especially in light of the presumption that federal law does not preempt state law.  *See R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176 (8th Cir. 2023) ("'[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading,' [courts] must 'accept the reading that disfavors pre-emption.'" (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)).

Target's remaining arguments for preemption are also unpersuasive.

First, Target insists that success on plaintiffs' claims would force it to make additional disclosures on its labels, because the DMH products would still be sold in a combo pack with nighttime cold-and-flu medicines that are required to carry a drowsiness warning, so mere silence about the "daytime" medicines would imply that they do not cause drowsiness.  *See, e.g.*, 21 C.F.R. § 341.72(c)(6)(iii) (requiring drowsiness warning for antihistamine listed as ingredient in combo-pack graphic displayed in Am. Compl. ¶ 18).  But there is an easy solution to this problem that does not involve adding anything to any label:  Target can simply stop selling combo packs.

---

[2]These paragraphs consist of a discussion of why the FDA decided to endorse claims that an antitussive can aid sleep by *suppressing a cough*, *see* 48 Fed. Reg. at 48,589, which has only a tenuous connection to the question of whether DMH may be labeled as non-drowsy.  This excerpt even acknowledges that the FDA's advisory panel "made no mention of drowsiness" in its discussion of DMH.  *Id.*

Second, Target argues that allowing claims such as plaintiffs' to go forward may lead to different states imposing different drug-labeling requirements, which is the very harm that § 379r(a) seeks to prevent. Again, though, the only thing that this lawsuit seeks to prevent is a retailer voluntarily placing a false statement on the label of an OTC medication. The FDCA, the applicable monograph, and state consumer-protection laws are entirely consistent in forbidding misleading statements on the labels of OTC medications. It is certainly possible that some courts will find that DMH does not cause drowsiness (and thus that statements such as Target's are not misleading), while other courts will find that DMH does cause drowsiness. But this does not mean that Target is facing conflicting *legal requirements*. It simply means that there may be differences in the way that the identical legal requirement ("a drug label must not mislead consumers") is applied by various courts. Inconsistent application of a consistent legal standard is an inevitable consequence of allowing state laws to "'parallel,' rather than add to, federal requirements," which the Supreme Court has explicitly sanctioned. *Riegel*, 552 U.S. at 330 (quoting *Medtronic*, 518 U.S. at 495 (1996)).

In sum, plaintiffs allege that Target's "non-drowsy" and "daytime" assertions are false. *See, e.g.*, Am. Compl. ¶ 32. Section 502 of the FDCA bans false and misleading drug labeling, *see* 21 U.S.C. § 352(a)(1), and the relevant monograph explicitly incorporates this prohibition. *See, e.g.*, 21 C.F.R. § 330.1(c) (requiring OTC drugs to be

"labeled in compliance with chapter V of the [FDCA]"); *id.* § 341.1(a) (requiring OTC

drugs covered by monograph to meet "each of the conditions in this part and each of

the general conditions established in § 330.1"). Plaintiffs are thus pursuing "parallel"

state-law claims by attempting to use state law to "independently enforce FDA

regulations" against false and misleading labeling. *Carter v. Novartis Consumer Health,

Inc.*, 582 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008). Such parallel claims are not preempted.

### D. Warranty and Breach of Contract

Target separately moves to dismiss plaintiffs' claims for breach of warranty and

breach of contract (Counts IX and X respectively), primarily on the grounds that

plaintiffs did not provide Target with adequate notice of their claims as required by § 2-

607 of the Uniform Commercial Code ("UCC"). That section mandates that a buyer

"must within a reasonable time after he discovers or should have discovered any breach

notify the seller of breach or be barred from any remedy." U.C.C. § 2-607; *see also* Cal.

Com. Code § 2607(3)(A); Idaho Code § 28-2-607; 810 Ill. Comp. Stat. 5/2-607. "The

purpose of giving notice of breach is to allow the breaching party to cure the breach and

thereby avoid the necessity of litigating the matter in court." *Alvarez v. Chevron Corp.*,

656 F.3d 925, 932 (9th Cir. 2011); *see also Maldonado v. Creative Woodworking Concepts, Inc.*,

694 N.E.2d 1021, 1025 (Ill. App. Ct. 1998) (reciting similar principle). "[T]imeliness

under UCC 2-607(3)(a) . . . is generally a question of fact." *Good v. Harry's Dairy, LLC,*

461 P.3d 765, 772 (Idaho 2020); *see also Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 87

Cal. Rptr. 3d 5, 21 (Cal Ct. App. 2008) ("The question whether notice was properly

given must be determined from the particular circumstances and, where but one

inference can be drawn from undisputed facts, the issue may be determined as a matter

of law." (quotation omitted)); *Maldonado*, 694 N.E.2d at 1026 (reciting similar principle).

Target concedes that it received a notice letter from each plaintiff. *See*

Weissenberger Decl. Exs. G, H, I. But Target argues that plaintiffs filed this lawsuit

before Target had adequate time to cure the breach in response to the letters. Lopez

gave Target 103 days,[3] Bruno gave 12 days, and Stephens gave 2 days. *See id.*

According to Target, these were not reasonable amounts of time under U.C.C. § 2-607.

The Court agrees with Target about Stephens, but not about Lopez and Bruno.

Target could have easily cured by refunding the purchase price for each plaintiff's

allegedly defective medicine. The Court cannot hold as a matter of law that 103 and 12

days are insufficient for a sophisticated retailer like Target to process a refund. *See, e.g.*,

*Cardinal Health 301*, 87 Cal. Rptr. 3d at 21 (permitting court determination of sufficiency

of notice only "where but one inference can be drawn from undisputed facts");

---

[3]Target contends that Lopez sued Target in California two weeks after it received the notice letter that she sent on May 10, but Target's contention is not supported by the record before the Court. Lopez joined this lawsuit at the time that the Amended Complaint was filed on August 22, 2022, which was 103 days after Target says it received her notice letter. *See* ECF No. 23.

*Maldonado*, 694 N.E.2d at 1026 ("When no inference can be drawn from the evidence other than that the notification was unreasonable, the question can be decided by the court as a matter of law.")

As to Stephens, however, the Court holds that two days is not enough time for a large corporation like Target to process a refund in response to a pre-litigation demand letter sent to the general counsel's office. *See* Weissenberger Decl. Ex. I. Moreover, Stephens's claim cannot be saved by the so-called "actual knowledge" exception to the notice requirement, which courts apply "when the seller has actual knowledge of the product's failure based on the seller's own observations." *Arcor, Inc. v. Textron, Inc.*, 960 F.2d 710, 715 (7th Cir. 1992). Plaintiffs cite cases from California and Illinois regarding this exception, but Idaho law governs Stephens's claim, and plaintiffs do not cite (and the Court has not found) any Idaho authority applying the actual-knowledge exception. Given the variation among states as to what does and does not satisfy § 2-607(3)'s notice requirement, *see In re Rust-Oleum Restore Mktg., Sales Pracs. & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 801 (N.D. Ill. 2016) (collecting cases), this Court cannot find that the Idaho courts would adopt the actual-knowledge exception. Accordingly, Stephens's claim for breach of contract in Count X will be dismissed.

Target also complains about the substance of the notice provided by plaintiffs. Target seems to complain that the notice letters accused Target only of breaching

express warranties and violating consumer-protection laws, but not of breaching

contracts.  In support of its argument, Target points to *Connick v. Suzuki Motor Co., Ltd.*,

which stated that the "notice 'of the breach' required is not of the facts . . . but of *buyer's*

*claim* that they constitute a breach."  675 N.E.2d 584, 590 (Ill. 1996) (quoting *Am. Mfg. Co.*

*v. U.S. Shipping Bd. Emergency Fleet Corp.*, 7 F.2d 565, 566 (2d Cir. 1925)).

Target misinterprets this passage.  *Connick* addresses whether a buyer's

generalized knowledge of a problem with a product satisfies the actual-knowledge

exception to the notice requirement.  *Id.*  The case makes clear that "it is unnecessary to

list specific claims" in a notice, so long as the seller is "notified that *this particular*

*transaction* is 'troublesome and must be watched.'"  675 N.E.2d at 590 (quoting 810 Ill.

Comp. Stat. 5/2-607 cmt. 4).  Each plaintiff's letter to Target easily clears that hurdle.  *See*

Weissenberger Decl. Exs. G, H, I.

 Finally, Target argues that Lopez's warranty and contract claims should be

dismissed because the "non-drowsy" and "daytime" representations are not

affirmations of fact as required under California law.  *See, e.g.*, Cal. Com. Code § 2313(1);

*Keith v. Buchanan*, 220 Cal. Rptr. 392, 395 (Cal. Ct. App. 1985).  Target is mistaken.  As

Target acknowledges, an express warranty may be created not only by an affirmation of

fact, but also by a "description of the goods which is made part of the basis of the

bargain."  Cal. Com. Code § 2313(1)(b).  The argument that the "non-drowsy" and

-21-

"daytime" representations that Target placed on the labels of its cold-and-flu medicines were neither affirmations of fact nor descriptions of the goods is plainly meritless.

### E.  Equitable Relief

Finally, Target moves to dismiss plaintiffs' unjust-enrichment claims and the complaint's prayer for injunctive relief.

Target's motion to dismiss the unjust-enrichment claims is somewhat pointless, as the scope of discovery will remain the same with or without those claims.  That said, the Court agrees with Target that the unjust-claims have not been plausibly pleaded. Plaintiffs point out that the Federal Rules of Civil Procedure permit pleading in the alternative, but plaintiffs fail to recognize that "under those same Federal Rules of Civil Procedure, each of the alternative claims must be plausible."  *Moreno v. Wells Fargo Bank, N.A.*, 18-CV-2760 (PJS/DTS), 2019 WL 1438248, at *7 (D. Minn. Apr. 1, 2019).  Here, the "alternative" unjust-enrichment claims are not plausible as the complaint does not allege—even in the alternative—that plaintiffs lack an adequate remedy at law.  *See, e.g., Collins v. eMachines, Inc.*, 134 Cal. Rptr 3d 588, 596–97 (Cal. Ct. App. 2011) (affirming dismissal of unjust-enrichment claim based on conclusion that plaintiff's consumer-protection claims provided adequate legal remedy); *Mannos v. Moss*, 155 P.3d 1166, 1173 (Idaho 2007) (holding unjust-enrichment claim was not viable where plaintiff had "the ability to pursue other legal remedies, including a claim for fraud"); *Shaw v. Hyatt Int'l*

*Corp.*, 461 F.3d 899, 902 (7th Cir. 2006) (affirming dismissal of unjust-enrichment claim pleaded alongside consumer-protection claim and premised on breach of contractual promise (citing *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. Ct. 2005))). Count III will thus be dismissed.

Target's motion to dismiss the prayer for injunctive relief is premature.  The complaint "alleges plausible claims for which injunctive relief may be available." *Oxygenator Water Techs., Inc. v. Tennant Co.*, No. 20-CV-0358 (ECT/HB), 2020 WL 4572062, at *6 (D. Minn. Aug. 7, 2020); *see also id.* ("[C]ourts on balance seem reticent to dismiss requests for injunctive relief at the pleading stage and have held that '[a] claim for permanent injunction should not be stricken at the pleading stage when the underlying claim is not dismissed.'" (quoting *Jerez v. Holder*, No. 10-CV-4498 (JRT/LIB), 2011 WL 7637808, at *12 (D. Minn. Sept. 1, 2011), *report and recommendation adopted as modified*, 2012 WL 1072581 (D. Minn. Mar. 30, 2012))).  Until this Court or a jury decides the merits of those claims, there is no point in addressing what remedies will or will not be available.  The Court will therefore deny Target's motion to dismiss the prayer for injunctive relief without prejudice.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT defendant's motion to dismiss [ECF No. 35] is

GRANTED IN PART and DENIED IN PART as follows:

1.      Count III of the amended complaint [ECF No. 23] is DISMISSED

WITHOUT PREJUDICE;

2.      Plaintiff Stephens's claim in Count X of the amended complaint

[ECF No. 23] is DISMISSED WITH PREJUDICE; and

3.      The motion is DENIED in all other respects.

Dated:  September 25, 2023                  s/Patrick J. Schiltz_____
                                            Patrick J. Schiltz, Chief Judge
                                            United States District Court